UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | | |
|---|---|---|
| STEPHANIE PATTON, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Case No. 4:13 CV 2376 CDP |
| | ) | |
| CASSIE BLUM, et al., | ) | |
| | ) | |
| Defendants. | ) | |

# MEMORANDUM AND ORDER

Plaintiff Stephanie Patton operated a state-licensed adult day care facility in Saint Louis. In October 2008, inspectors from the Missouri Department of Health and Senior Services (DHSS) arrived at the facility to conduct an inspection. Things went downhill from there. After a series of escalating incidents, the facility closed, and DHSS revoked its license. Patton appealed several decisions made by DHSS and another state agency, the Department of Social Services, to the state's Administrative Hearing Commission. The AHC ruled for Patton in each of its findings. The agencies appealed to Missouri state court, which largely left the AHC's findings intact. Now, Patton brings claims against four DHSS employees related to the inspection and eventual closure of her adult day care facility. She filed this action in state court, and defendants removed on November 22, 2013.

Citing Rule 12(b)(6), Fed. R. Civ. P., the defendants have moved to dismiss four of the six claims in the complaint. I find that Patton has alleged enough to support each of her claims, so I will deny the defendants' motion, except that I will grant it as to Count VI (malicious trespass) and dismiss the portion of that claim that relates to real property. I will also dismiss Count I (due process) only as against defendant Cassie Blue because none of Patton's allegations related to that count implicate Blum.

## I. Background[1]

In 1993, Patton opened an adult day care facility in Saint Louis dedicated to serving African American residents. For fifteen years, she operated the facility, called Peace of Mind Adult Day Care, without incident. On October 16, 2008, two DHSS inspectors, Cassie Blum and Sharon Buckner, arrived at the facility to conduct an unannounced inspection. Patton wished to accompany Blum and Buckner during the inspection, but Blum told her she could not do so. A dispute ensued, and Blum struck Patton on the hand, calling her a "nigger" and "illiterate."

Later, Patton called Tracy Cleeton, a DHSS employee who had previously inspected Peace of Mind. She complained about the treatment she received.

---

[1] The facts that follow are based on the allegations set out in Patton's complaint, and are considered true for the purpose of this Memorandum and Order. *See Ashcroft v. Iqbal*, 556 U.S. 662, 678–79 (2009); *Neitzke v. Williams*, 490 U.S. 319, 326–27 (1989).

Cleeton advised her to call the inspectors' regional supervisor, Mary Collier. Patton called to speak with Collier but asked for "Mary," so she ended up speaking with another DHSS employee. When Patton determined she had spoken to the wrong person, she contacted Collier by telephone and letter. In response, Patton received a letter from a DHSS attorney admonishing her to cooperate with inspectors without mentioning Blum's behavior toward Patton.

DHSS employees Cleeton, Tracy Niekamp, and Michelle Williamson discussed Patton's telephone call to Cleeton, as well as a police report apparently filed about the incident, and statements from Blum and Buckner. They decided that Niekamp and Williamson would conduct a follow-up inspection of Peace of Mind. On December 5, 2008, they inspected Peace of Mind, citing Patton for minor issues and for not having a nurse on duty. Niekamp and Williamson concluded no nurse was on duty without asking any employees whether there was a nurse present or conducting an exit interview with Patton, which was customary. In fact, there were two nurses on duty and present at the time of the inspection.

Peace of Mind's adult day care license was set to expire on December 20, 2008. In a letter dated December 19, 2008, Williamson, Niekamp, and Cleeton issued Patton a provisional license and informed her that the license had been

converted from a "medical model" to a "social model" license. This letter did not inform Patton of her right to appeal the decision or receive a hearing.

DHSS inspectors Niekamp and Williamson prepared their inspection report on January 13, 2009. Because it was prepared several weeks after the inspection, it was not signed by Patton as was customary. Niekamp and Williamson issued a "statement of deficiencies" to Patton on January 14, 2009. A few days later, Patton submitted a plan of correction, which DHSS accepted.

On February 2, 2009, the Missouri Department of Social Services (DSS) notified Patton that her participation agreement with MO HealthNet had been retroactively terminated as of December 20, 2008. MO HealthNet is Missouri's Medicaid program. DSS told Patton that the termination was because Peace of Mind now had a "social model" license rather than a "medical model" license. Patton disputes that Missouri law makes any distinction whatsoever between "medical model" and "social model" licenses. However, because her participation agreement was terminated, she lost the opportunity to get Medicaid funding. This was devastating because nearly all of Peace of Mind's residents were dependent on Medicaid. Even before sending the February 2 letter, DSS had begun denying reimbursement for outstanding MO HealthNet claims.

Inspectors conducted two revisit surveys in early February. At the first visit, only minor issues were cited. At the second visit, inspectors found that Peace of Mind substantially complied with all licensure laws, employed a nurse, and qualified as a "medical model" adult day care facility.

After the revisits, Patton sought to re-enroll her facility as a MO HealthNet provider with DSS. The agency sent her an open-ended, unrestricted participation agreement, which Patton signed and returned in March 2009. But DSS did not sign the agreement. Instead, it sent a DSS employee to meet with Patton in a state representative's office. The employee, Judith Muck, agreed to send a closed-end provider agreement to Patton, which Muck represented would be made retroactive to February 11, 2009. By this time, Patton had been locked out of the facility by her landlord, so she borrowed money from friends to regain access to the building.

Despite the reassurances from Muck, DSS refused to pay MO HealthNet claims from February and March. DSS apparently conditioned this refusal on Patton's failure to provide information required by the previous participation agreement.

When Patton attempted to bring her case to the attention of supervisors at DSS and DHSS, state legislators, and the governor's office, agency employees began investigating Patton for MO HealthNet overpayments. DSS requested from

Patton documents related to past claims. Patton informed DSS that the documents had been lost, some in the 2008 flood of University City, where Peace of Mind was located, and some when Patton's landlord threw her belongings in the street after she failed to make rent payments during the ongoing incident. DSS then sought $487,462.08 from Patton in alleged overpayments because she could not produce the documents it sought.

On June 4, 2009, DHSS employee Cleeton sent Patton a letter notifying her that the agency had visited Peace of Mind and found it closed and vacant. The letter stated that DHSS would consider the facility closed and revoke her license if she did not respond. On July 7, 2009, another DHSS employee revoked Peace of Mind's license by letter. Neither letter informed Patton of her right to appeal.

Patton appealed six decisions[2] by DHSS and DSS to the Missouri Administrative Hearing Commission, which found in her favor. The agencies appealed to circuit court and eventually the Missouri Court of Appeals. The appellate court largely affirmed the AHC's determinations, with the exception of

---

[2] Those decisions were: DHSS's conversion of Peace of Mind's license from a medical model to a social model; (2) DSS's first termination of Peace of Mind's participation in the MO HealthNet program, for failure to have a medical model license; (3) DSS's second termination of Peace of Mind's participation in the MO HealthNet program, for failure to produce the requested records; (4) DSS's assessment of an overpayment; (5) DHSS's termination of its participation agreement with Peace of Mind; and (6) DHSS's eventual revocation of Peace of Mind's license. *See Dep't of Soc. Servs. v. Peace of Mind Adult Day Care Cntr.*, 377 S.W.3d 631, 636–37 (Mo. Ct. App. 2012) (reviewing AHC decision).

its conclusion that DHSS had acted with a racially discriminatory animus toward Patton. As a result, Patton did not have to pay the overpayment sanction and was reimbursed for services provided by Peace of Mind from December 20, 2008 to February 20, 2009. The AHC also found that Peace of Mind was entitled to a provider participation agreement.

Because of her struggle with DHSS and DSS, and the eventual loss of her business, Patton accumulated a significant amount of debt, which impaired her credit rating. Her house was foreclosed upon, and her reputation, mental and physical health, and family have suffered.

## II. <u>Claims</u>

Patton now brings claims against DHSS employees Blum, Cleeton, Niekamp, and Williamson, in their individual and official capacities. Her claims are titled as follows: Count I – Violations of Right to Fair Notice of Laws and To Notice and an Opportunity to be Heard (Due Process Violations); Count II – Violation of the Right to be Free from Racial Discrimination and Arbitrary and Selective Enforcement of Laws (Equal Protection Violation); Count III – Violation of Right to Free Speech and to Petition Government (First Amendment Violation); Count IV – Violation of § 536.021, RSMo; Count V – Violation of Right to Notice and Opportunity to be Heard (Due Process Violation); and Count VI – Malicious

Trespass. Patton seeks compensatory, nominal, punitive, and statutory damages, costs and attorney fees, and a declaration that the distinctions between medical model and social model licenses are unlawful and void. The defendants have moved to dismiss four of Patton's claims under Rule 12(b)(6), Fed. R. Civ. P.

### III. Motion to Dismiss Standard

The purpose of a motion to dismiss under Rule 12(b)(6) is to test the legal sufficiency of the complaint. When considering a 12(b)(6) motion, the court assumes the factual allegations of a complaint are true and construes them in favor of the plaintiff. *Neitzke v. Williams*, 490 U.S. 319, 326–27 (1989).

Rule 8(a)(2), Fed. R. Civ. P., provides that a complaint must contain "a short and plain statement of the claim showing that the pleader is entitled to relief." In *Bell Atlantic Corp. v. Twombly*, the Supreme Court clarified that Rule 8(a)(2) requires complaints to contain "more than labels and conclusions, and a formulaic recitation of the elements of a cause of action." 550 U.S. 544, 555 (2007); *accord Ashcroft v. Iqbal*, 556 U.S. 662, 678–79 (2009). Specifically, to survive a motion to dismiss, a complaint must contain enough factual allegations, accepted as true, to state a claim for relief "that is plausible on its face." *Twombly*, 550 U.S. at 570.

### IV. Discussion

I will address each of the contested claims in turn.

## *Count I: Due Process*

In Count I, Patton alleges that the defendants intentionally deprived her of her property and liberty interests in her adult day care license and MO HealthNet (Medicaid) provider agreement in violation of her due process rights.  Specifically, she alleges that defendants Niekamp, Williamson, and Cleeton converted Peace of Mind's adult day care license to a "social model" without notifying the facility of its right to appeal that decision or giving Patton notice of the deficiencies and an opportunity to correct them; that they failed to conduct an exit interview with her upon their completion of the December 2008 inspection; and that they failed to timely provide her with a statement of deficiencies.  Patton further alleges that there is no legal distinction between "medical model" and "social model" licenses for adult day cares, and so defendants Niekamp, Williamson, and Cleeton violated Mo. Rev. Stat. § 536.021 by applying an unpromulgated rule against her.  She also alleges that her due process rights were violated when DSS terminated her MO HealthNet provider agreement based on the facility's failure to maintain a medical model license.  Finally, she alleges that defendant Cleeton, along with a non-party, improperly revoked her license by his letters in June and July 2009, without notifying Patton of her right to appeal.

The defendants argue that this claim should be dismissed. The thrust of the defendants' argument is that Patton has already received all the process she was due through the AHC hearing and appellate review of that decision by the courts. According to the defendants, their only obligation was to provide some opportunity to be heard, and they met that obligation by providing the AHC appeals channel.

Patton responds that Missouri law specifically requires DHSS to provide notice of the right to appeal whenever DHSS refuses to issue a license or to suspend or revoke an existing license, as well as a reasonable opportunity to correct deficiencies before suspending or revoking a license. *See* Mo. Rev. Stat. § 660.416; 19 CSR 30-90.020(10)(D). She alleges that the defendants failed to comply with these laws, which violated her due process rights and caused her to suffer "legally cognizable injuries." She argues that her claim is one for damages, which is different from the issues she litigated during her defense before the AHC.

As a preliminary matter, although Patton alleges that "all defendants" deprived her of due process under Count I, she does not describe any involvement by defendant Blum. None of the actions she cites after the initial inspection was taken by Blum, and Patton does not allege that the initial inspection abridged her due process rights. Therefore, Count I will be dismissed as against defendant Blum.

The AHC has limited subject matter jurisdiction. *See State ex rel. Mo. Health Care Ass'n v. Mo. Health Facilities Review Comm.*, 768 S.W.2d 559, 562 (Mo. Ct. App. 1988) (AHC "has only such jurisdiction or authority as may be granted by the legislature" and its jurisdiction "cannot be enlarged" by agreement of the parties). Through the AHC process, Patton could – and did – get some forms of relief. But defendants do not cite, and I have not found, any statute conveying jurisdiction to the AHC over a due process claim for damages or for a declaration that there is no distinction between "medical model" and "social model" adult day care licenses. *See State Tax Comm'n v. Admin. Hearing Comm'n*, 641 S.W.2d 69, 75 (Mo. banc 1982) (AHC cannot render declaratory judgments); *see also C. Line, Inc. v. City of Davenport*, 957 F. Supp. 2d 1012, 1034 (S.D. Iowa 2013) (adult-oriented business that sued city for alleged procedural due process violation related to denying license "was not compelled to pursue its claim for damages to its conclusion in state court because its damage claim was not a mandatory appeal from an administrative action").[3] Further, it is unclear how Patton could have sued individual defendants through the AHC and appellate review process.

---

[3] Appellate review of the AHC decision was also limited, and the courts on appeal from the AHC could not have granted the relief Patton now seeks. *See Mo. Dep't of Soc. Servs., Div. of Med. Servs. v. Great Plains Hosp.*, 930 S.W.2d 429, 433 (Mo. Ct. App. 1996) (standard of review for administrative appeals).

Generally, the Fourteenth Amendment to the United States Constitution prohibits states from depriving a person of her property without notice and an opportunity to be heard. *Crum v. Vincent*, 493 F.3d 988, 992 (8th Cir. 2007). In order to succeed on a due process claim, Patton must establish that she had a "clearly established constitutionally protected liberty or property interest" and that the defendants deprived her of that interest. *See Austell v. Sprenger*, 690 F.3d 929, 935 (8th Cir. 2012).

Even assuming that Missouri law affords each of the rights Patton alleges she had, those rights do not necessarily attach to constitutionally cognizable property interests. *Id.* at 937. "Such a doctrine would turn every state-law violation into a substantive due process claim, a result that would obliterate completely the distinction between state law and the federal Constitution." *Id.* (quoting *Bagley v. Rogerson*, 5 F.3d 325, 328 (8th Cir. 1993)); *see also Marler v. Mo. Bd. of Optometry*, 102 F.3d 1453, 1457 (8th Cir. 1996) ("We have stated many times . . . that a violation of state law, without more, does not state a claim under the federal Constitution or 42 U.S.C. § 1983.") (internal quotation marks omitted). That said, however, a constitutionally cognizable property interest will arise where a state law creates a justifiable expectation of entitlement. *Bloodman v. Kimbrell*, 533 Fed. Appx. 678, 679 (8th Cir. 2013).

At this stage, I cannot determine whether the defendants curtailed some clearly established, constitutionally protected interest of Patton despite her justifiable expectation of entitlement. It is highly likely that many of the deficiencies she complains of were merely "state conferred procedural safeguard[s] which [are] not enforceable under the federal Constitution's Due Process Clause." *Austell*, 690 F.3d at 937. But defendants have not fully briefed this issue, and so I cannot decide it now. As such, I will deny their motion to dismiss as to Count I, except that I will dismiss Count I as against defendant Blum.

### *Count II: Equal Protection*

In Count II, Patton alleges that the defendants violated her right to equal protection by treating her differently than similarly situated Caucasian adult day care providers. She alleges that defendants Cleeton, Niekamp, and Williamson intentionally furthered defendant Blum's demonstrated racial animus toward Patton by arbitrarily and selectively enforcing licensure standards and Medicaid program participation requirements.

The defendants argue that Count II should be dismissed because the state appellate court, when reviewing the AHC decision, already decided that DHSS had not acted with racially discriminatory animus toward Patton:

> The AHC concluded that DHSS, **as an agency**, acted with a racially discriminatory animus toward Patton. [emphasis in original]

– 13 –

> The only evidence in the record to support this legal conclusion was the testimony by Patton that a single DHSS employee, Blum, directed a deplorable racial epithet toward Patton and called her illiterate. There was no evidence presented at trial that Blum's statements could be legally attributed to DHSS as a whole or that DHSS was even aware the comments were made. Evidence that a single agency employee made a racial remark to Patton is insufficient as a matter of law to support a conclusion that the entire agency thereafter acted in its handling of Patton with racial animus. Even if the single (and wholly unacceptable) comment by Blum could be legally attributed to DHSS, standing alone that comment does not rise to the level of a constitutional violation in the absence of other evidence connecting the comment to subsequent agency action. The AHC erred in finding otherwise.

*Dep't of Soc. Servs. v. Peace of Mind Adult Day Care*, 377 S.W.3d 631, 646 (Mo. Ct. App. 2012). The defendants argue that this decision precludes Patton from relitigating the issue of racial animus. *See Knutson v. City of Fargo*, 600 F.3d 992, 996 (8th Cir. 2010) ("[O]nce a court has decided an issue of fact or law necessary to its judgment, that decision may preclude relitigation of the issue in a suit on a different cause of action involving a party to the first case.") (internal quotation omitted).

Missouri law on issue preclusion applies. *See Simmons v. O'Brien*, 77 F.3d 1093, 1096 (8th Cir. 1996). In Missouri, an issue is precluded when (1) the issue in the present action is identical to the issue decided in the prior adjudication; (2) the prior adjudication resulted in judgment on the merits; (3) the party against whom issue preclusion is asserted was a party or is in privity with a party to the

prior adjudication; and (4) the party against whom estoppel is asserted had a full and fair opportunity to litigate the issue in the prior suit. *State ex rel. Haley v. Groose*, 873 S.W.2d 221, 223 (Mo. banc 1994).

Although *Headley v. Bacon*, 828 F.2d 1272 (8th Cir. 1987) involved claim preclusion rather than issue preclusion, it is still instructive. *See Montana v. United States*, 440 U.S. 147, 153 (1979) (doctrines are related). In *Headley*, a police officer successfully sued her former employer-city under Title VII for sex discrimination and was awarded the equitable relief of back pay, front pay, and attorney fees. She then sued several officers in their individual and official capacity for violations of her rights to due process, equal protection, and free speech. The district court granted the defendant officers' motion for summary judgment on claim preclusion grounds, holding that the plaintiff should have joined her claims against the officers in her first case. The Eighth Circuit reversed, holding that the defendants' interests were not so aligned with their employer city so as to preclude the second suit against them in their individual capacities. The court also held that "even for the claims brought against them in their official capacity, privity [was] not automatic" and could not be determined until the record was developed. *Id.* at 1279.

Here, again, the AHC has limited jurisdiction. *Montana*, 440 U.S. at 153 (for issue prelusion to apply, issue must have been determined by court of competent jurisdiction). Patton did not litigate the issue of racially discriminatory conduct by any of the defendants in their official or individual capacities, and presumably, she could not have done so. Although "[l]itigation involving the government is generally binding with respect to government officials who are sued in their official capacities in later actions," it depends on those officials' role in the agency. *See Headley*, 828 F.2d at 1276, 1279. All the appellate court decided was that the racially discriminatory conduct shown to Patton by Blum could not, as a matter of law, demonstrate that DHSS had acted with racially discriminatory animus toward Patton. It may be true, as defendants argue, that Patton makes substantially the same allegations as she did in the AHC action. It may also be true that she will later be precluded from arguing that the defendants – in their official capacity – engaged in racial animus. But this will be more appropriately addressed on summary judgment, where I will have the benefit of a full record explaining the defendants' roles within DHSS. At this stage of the case, I cannot find that Patton had a full and fair opportunity to litigate the issue of racial animus by the individual defendants. Therefore, defendants' motion to dismiss will be denied as to Count II.

### Count IV: Violation of Mo. Rev. Stat. § 536.021

In Count IV, Patton alleges that the defendants improperly barred her from participating in the Missouri Medicaid program (MO HealthNet) while she had a "social model" adult day care license. She alleges that Missouri law does not distinguish between "medical model" and "social model" licenses, and that a "medical model" license is not a requirement under state law to participate in the Medicaid program. Patton alleges that to the extent that the defendants treated it as a requirement, their actions constituted an unpromulgated rule in violation of Mo. Rev. Stat. § 536.021.

In order to promulgate an administrative rule, an agency must comply with the rulemaking procedures specified in Section 536.021. *NME Hospitals, Inc. v. Dep't of Soc. Servs., Div. of Med. Servs.*, 850 S.W.2d 71, 74 (Mo. banc 1993). The failure to formally adopt a rule in compliance with Section 536.021 renders that rule null and void. *See Degraffenreid v. State Bd. of Mediation*, 379 S.W.3d 171, 184 (Mo. Ct. App. 2012). A "rule" is an "announcement by a state agency of a generally applicable policy or interpretation of law 'that has future effect and acts on unnamed and unspecified facts.'" *Id.* (quoting *Dep't of Soc. Servs., Div. of Med. Servs. v. Little Hills Healthcare, LLC*, 236 S.W.3d 637, 642 (Mo. banc 2007)); *see also* Mo. Rev. Stat. § 536.010(6). A rule is generally distinguished

from a case-specific adjudication, but "[i]f a state agency suddenly applies a new (but unpromulgated) generally applicable policy, even *within* a case-specific adjudication, the agency may be at fault for failure to promulgate the new policy." *Id.* at 185. An agency is liable for attorneys' fees in any litigation that establishes the agency's failure to pursue rulemaking. *Id.* (citing Mo. Rev. Stat. § 536.021.9).

The defendants argue that Mo. Rev. Stat. § 536.021 creates a statutorily defined cause of action, which "must be technically and strictly construed," *see Asmus v. Capital Region Family Practice*, 115 S.W.3d 427, 435 (Mo. Ct. App. 2003), and Patton has sued individuals, not an "agency" as the statute requires.[4] As such, they contend that her claim should be dismissed.

Section 536.021 provides, in relevant part:

> If it is found in a contested case by an administrative or judicial fact finder that a state agency's action was based upon a statement of general applicability which should have been adopted as a rule, as required by sections 536.010 to 536.050, and that agency was put on notice in writing of such deficiency prior to the administrative or judicial hearing on such matter, then the administrative or judicial fact

---

[4] Both parties quote Mo. Rev. Stat. § 536.021 incorrectly. The language they rely on is: "Any person who is or may be aggrieved by any rule promulgated by a state agency shall have standing to challenge any rule promulgated by a state agency and may bring such an action pursuant to the provisions of section 536.050. Such person shall not be required to exhaust any administrative remedy and shall be considered a nonstate party." This language actually appears in Section 536.053, and it is not clear this section applies. Patton is challenging an allegedly *unpromulgated* rule, not claiming she was aggrieved by a promulgated rule. *See United Pharmacal Co. of Mo., Inc. v. Mo. Bd. of Pharmacy*, 159 S.W.3d 361, 366 (Mo. banc 2005) (distinguishing between rules that purport to be promulgated and agency statements that may or may not be rules). Even if Section 536.050 does apply, it does not require dismissal for the reasons stated above.

> finder shall award the prevailing nonstate agency party its reasonable attorney's fees incurred prior to the award, not to exceed the amount in controversy in the original action.

Under Mo. Rev. Stat. § 536.010, which sets forth the definitions applicable to Section 536.021, "state agency" and "agency," separately listed, are both defined to include individual administrative officers.[5] The individual defendants may in fact be officers. Defendants do not argue otherwise, nor do they raise any other issue related to the sufficiency of this count. Therefore, the motion to dismiss will be denied as to Count IV.

### *Count VI: Malicious Trespass*

In Count VI, Patton claims that the defendants "maliciously or wantonly damaged or destroyed" her "real property and intangible property rights" in violation of Mo. Rev. Stat. § 537.330, providing double damages for malicious trespass. Defendants argue that Patton cannot bring a malicious trespass claim based on damage to her real property. Defendants are correct. The Missouri statute applies only to "personal property, goods, chattels, furniture or livestock," *id.*, and a Missouri appellate court has interpreted the statute to include intangible

---

[5] Section 536.010(2) provides "'**Agency**' means any administrative officer or body existing under the constitution or by law and authorized by law or the constitution to make rules or to adjudicate contested cases, except those in the legislative or judicial branches." Section 536.010(8) provides "'**State agency**' means each board, commission, department, officer or other administrative office or unit of the state other than the general assembly, the courts, the governor, or a political subdivision of the state, existing under the constitution or statute, and authorized by the constitution or statute to make rules or to adjudicate contested cases."

property. *See Weicht v. Suburban Newspapers of Greater St. Louis, Inc.*, 32 S.W.3d 592, 599 (Mo. Ct. App. 2000). The statute, by its very wording, does not apply to real property. *See id.* at 600. As such, I will grant defendants' motion to dismiss the portion of Count VI that relates to real property.[6]

## V. Conclusion

Based on the foregoing,

**IT IS HEREBY ORDERED** that defendants' motion to dismiss [#6] is denied except that Count I (Due Process) is dismissed as to defendant Cassie Blum and the portion of Count VI (Malicious Trespass) that relates to real property is dismissed.

This case will be set for a Rule 16 Scheduling Conference by separate order.

                                                  */s/ Catherine D. Perry*
                                                  CATHERINE D. PERRY
                                                  UNITED STATES DISTRICT JUDGE

Dated this 4th day of April, 2014.

---

[6] Plaintiff objects that she meant "tangible" when she used the word "real," and that interpreting "real property" as land or real estate "would defy a fair reading of her complaint." Regardless of plaintiff's intent, "real property" is universally understood to be "[l]and and anything growing on, attached to, or erected on it, excluding anything that may be severed without injury to the land." BLACK'S LAW DICTIONARY 1234 (7th ed. 1999).