UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

STEPHANIE PATTON,                    )
                                     )
            Plaintiff,               )
                                     )
      vs.                            )          Case No. 4:13 CV 2376 CDP
                                     )
CASSIE BLUM, et al.,                 )
                                     )
            Defendants.              )


**MEMORANDUM AND ORDER**

Plaintiff Stephanie Patton operated a state-licensed adult day care facility in

St. Louis called Peace of Mind Adult Day Care Center (POM).  In October 2008,

inspectors from the Missouri Department of Health and Senior Services (DHSS)

arrived at the POM facility to conduct an inspection, which quickly went south.

After a subsequent series of escalating incidents involving POM, DHSS, and the

Missouri Department of Social Services (DSS), POM eventually closed.  In this

case, Patton has alleged six claims against four DHSS employees.  In Counts I, II,

III, and V, pursuant to 42 U.S.C. § 1983, Patton has alleged violations of her due

process, equal protection, and free speech and petition rights.  In Count IV she

alleges defendants promulgated an agency rule without proper notice in violation

of Missouri statutory law.  In Count VI, Patton alleges defendants interfered with

her intangible property rights in her adult day care license in violation of Missouri's malicious trespass law.

Defendants have moved for summary judgment as to all of the claims. After careful consideration and a thorough review of the entire record, I find that defendants are entitled to qualified immunity as to Count I, Patton's first due process claim. As to the remainder of the claims, I conclude that there is no evidence from which a reasonable jury could find the defendants violated Patton's constitutional rights or Missouri statute. Because there are no genuine disputes of material fact and defendants are entitled to judgment as a matter of law, I will grant summary judgment.

## I.    **Standards Governing Summary Judgment**

"Summary judgment is proper where the evidence, when viewed in a light most favorable to the non-moving party, indicates that no genuine issue of material fact exists and that the moving party is entitled to judgment as a matter of law." *Davison v. City of Minneapolis, Minn.*, 490 F.3d 648, 654 (8th Cir. 2007); see Fed. R. Civ. P. 56(a). Summary judgment is not appropriate if there are factual disputes that may affect the outcome of the case under the applicable substantive law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). An issue of material fact is genuine if the evidence would allow a reasonable jury to return a verdict for the non-moving party. *Id.* "The basic inquiry is whether it is so one-sided that one

party must prevail as a matter of law." *Diesel Machinery, Inc. v. B.R. Lee Industries, Inc.*, 418 F.3d 820, 832 (8th Cir. 2005) (internal quotation marks and citation omitted). The moving party has the initial burden of demonstrating the absence of a genuine issue of material fact. *Torgerson v. City of Rochester*, 643 F.3d 1031, 1042 (8th Cir. 2011) (citation omitted). If the movant does so, "[t]he nonmovant must do more than simply show that there is some metaphysical doubt as to the material facts, and must come forward with specific facts showing that there is a genuine issue for trial." *Id.* (internal quotation marks and citation omitted).

## II.    **Background**

The general facts of this case are as follows.[1]   Patton's license to operate an adult day care was due to expire on December 20, 2008. In October 2008, defendant Cassie Blum and another DHSS inspector arrived at POM for an unannounced inspection. Patton claims that the manner of the inspectors was disrespectful to begin with and quickly deteriorated until Blum slapped Patton's hand and called her a "nigger" and illiterate.

Because the Blum inspection ended before it could be completed, a subsequent inspection was performed in early December 2008 by defendants Tracy

---

[1] The facts set out in this section are either undisputed or, to the extent not addressed by the parties on summary judgment, are based on Patton's allegations. Additional facts are included with the discussion of each claim, as necessary.

Niekamp and Michelle Williamson. After their inspection, a letter dated December 19, 2008, was sent to Patton from defendant Tracy Cleeton, then the Program Manager for DHSS's Adult Day Care Program, informing her that DHSS had received her application to renew her adult day care license. The letter stated that because of deficiencies found during Niekamp and Williamson's inspection, she would be issued a provisional license instead of a regular license until the deficiencies could be remedied. (Def. Ex. B). It further stated that because POM did not employ a nurse, the provisional license would indicate the facility was a "social model" program instead of a "medical model" program.

In January 2009, Patton received a list of deficiencies found during the December inspection, which she quickly remedied. Thereafter, on February 11, DHSS conducted a revisit of POM; and on February 17, DHSS issued POM a regular, non-provisional license. The new license indicated that the facility once again qualified as a medical model program.

In February, before Patton received her new, non-provisional, "medical model" license, DSS notified her that because her medical license had been canceled by DHSS, her participation in the MO HealthNet (Medicaid) program was also canceled, retroactive to close of business December 20, 2008. (Pl. Ex. 7).

DSS also conducted an audit of POM in early 2009. Pursuant to the audit, Patton was required to produce patient service records from prior years, which she

refused to do, claiming that many of the records had been lost. Although POM's participation in the Medicaid program was briefly reinstated, DSS ultimately terminated POM's participation in April 2009 after POM failed to produce the requested records. Because of POM's exclusion from the Medicaid program, Patton was unable to obtain reimbursement from DSS for services rendered from December 2008 to April 2009. All of this led to insufficient funding for POM's operation, loss of clients, and the facility's eventual closure later in 2009.

In a letter dated July 7, 2009, DHSS informed Patton that more than a month before, its staff had been to her facility and found it locked and empty. The letter stated that because DHSS had received no response to a previous request to Patton, dated June 2009, to confirm the status of her business, POM's adult day care license was being revoked.

Patton appealed six decisions[2] by DHSS and DSS to the Missouri Administrative Hearing Commission, which found in her favor. The agencies appealed to circuit court and eventually the Missouri Court of Appeals. The appellate court largely affirmed the AHC's determinations, with the exception of its conclusion that DHSS had acted with a racially discriminatory animus toward

---

[2] Those decisions were: (1) DHSS's conversion of POM's license from a medical model to a social model; (2) DSS's first termination of POM's participation in the Medicaid program, for failure to have a medical model license; (3) DSS's second termination of POM's participation in the Medicaid program, for failure to produce requested records; (4) DSS's assessment of an overpayment; (5) DHSS's termination of its participation agreement with POM; and (6) DHSS's revocation of POM's license. *See Dep't of Soc. Servs. v. Peace of Mind Adult Day Care Cntr.*, 377 S.W.3d 631, 636–37 (Mo. Ct. App. 2012).

Patton.  As a result, Patton was reimbursed for services provided by POM from December 20, 2008 to February 20, 2009.

## III.  Discussion

### A.  Count I: Due Process

In Count I, Patton alleges that the defendants intentionally deprived her of her property interest[3] in her adult day care license and Medicaid provider agreement in violation of her due process rights. Specifically, she claims defendants Niekamp, Williamson, and Cleeton converted POM's adult day care license to a "social model" without notifying the facility of its right to appeal that decision or giving Patton notice of the deficiencies and an opportunity to correct them.  She further claims they failed to conduct an exit interview with her upon completion of the December 2008 inspection and that they failed to timely provide her with a statement of deficiencies.  Patton alleges that her due process rights were violated when DSS terminated her Medicaid provider agreement based on POM's failure to maintain a medical model license.  Finally, she asserts that defendant Cleeton improperly revoked her license in June and July 2009 without notifying Patton of her right to appeal.

---

[3] Patton's complaint asserts her liberty interests were also violated, but she has not argued this in her opposition to summary judgment, therefore I will assume her claim was limited to property interests.

In their motion, defendants argue that because DHSS possesses sufficient discretion in its regulation of adult day care facilities, Patton had no constitutionally protected property interest in any of these matters. They argue Patton's assertion that her license was "converted" from a medical model to a social model license is inaccurate. They claim her previous medical-model license expired and was not renewed, and because under Missouri law there is no protected property interest in the renewal of a license, Patton's claim must fail. Finally, they assert, in any case, that they are protected from these claims by qualified immunity.

In response, Patton argues that Missouri statute created a "justifiable expectation" in an existing adult day care license, and defendants had no discretion to "convert" plaintiff's license without a hearing before the Administrative Hearing Commission. Patton claims that this "conversion" was equivalent to the revocation of a current license. She claims she had a justifiable expectation in maintaining her current license status without conversion, and this expectation rose to the level of a protectable property interest. Patton also relies largely on the doctrine of collateral estoppel, claiming that issues in question surrounding this claim were decided by the AHC and the AHC's decision is binding on this court.

## *Patton's Adult Day Care License*

The first question is whether Patton's medical model license was revoked or simply not renewed. Despite Patton's insistence that what occurred was the "conversion" of an existing license (tantamount to a license revocation), she presented and argued essentially no facts to support this. The undisputed evidence demonstrates that one day before Patton's existing 2008 license was due scheduled to expire, Cleeton sent her a letter notifying her that DHSS had received her license renewal application, and she was being issued a new, provisional, non-medical model license. There is no indication that her 2008 medical model license was canceled, revoked, or converted before its expiration date. This is supported by the fact that when DSS informed Patton it would not be reimbursing her for services provided without a medical model license, the first date on which it indicated reimbursement would be withheld was after the close of business on December 20, 2008. This was the expiration date of Patton's previous, medical model license. In the absence of any facts contradicting these, I conclude that Patton's license was never converted or revoked. Rather, DHSS refused to renew it with the same status it had previously held.

In light of this, and in light of the legal and factual similarity of this case to *Austell v. Sprenger*, 690 F.3d 929, 935 (8th Cir. 2012), I conclude that the defendants are protected by qualified immunity because they could reasonably

have concluded that Patton had no constitutionally protected property interest in the renewal of her license.

A qualified-immunity analysis involves a two-step inquiry: (1) whether the facts shown by the plaintiff make out a violation of a constitutional or statutory right, and (2) whether that right was clearly established at the time of the defendant's alleged misconduct. *Pearson v. Callahan*, 555 U.S. 223, 231 (2009); *Smith v. City of Minneapolis*, 754 F.3d 541, 545 (8th Cir. 2014). Lower courts may decide which of the two prongs of the qualified immunity analysis to tackle first. *Pearson*, 555 U.S. at 236. Here, the "clearly established" prong is dispositive, so I will address that prong first. "A right is clearly established if its contours are sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Smith,* 754 F.3d at 546 (internal citation and quotation marks omitted). A case directly on point is not required, but "existing precedent must have placed the statutory or constitutional question beyond debate." *Id. citing Ashcroft v. al-Kidd*, 131 S.Ct. 2074, 2083 (2011).

In *Austell*, the Eighth Circuit examined whether employees of DHSS were protected by qualified immunity from plaintiffs' claim that they unconstitutionally interfered with plaintiffs' property interest in a childcare facility license and license renewal proceedings. 690 F.3d at 935.

"To have a constitutionally cognizable property interest in a right or a benefit, a person must have a 'legitimate claim of entitlement to it.'" *Austell v. Sprenger*, 690 F.3d 929, 935 (8th Cir. 2012) (quoting *Bd. of Regents of State Colleges v. Roth*, 408 U.S. 564, 577 (1972)). Property interests are not created by the Constitution but rather stem from an independent source such as state law. *Stauch v. City of Columbia Heights*, 212 F.3d 425, 429 (8th Cir. 2000). A property interest arises when state law creates "expectations that are 'justifiable.'" *Austell*, 690 F.3d at 935, (quoting *O'Bannon v. Town Ct. Nursing Ctr.,* 447 U.S. 773, 796 (1980)). No property interest arises where the statutory claim to a benefit is "too ephemeral and insubstantial." *Id.* (quoting *Meachum v. Fano*, 427 U.S. 215, 228 (1976)).

In *Austell*, the Eighth Circuit first determined that the plaintiffs, a Missouri childcare facility and its owner, had failed to demonstrate that they had a "clearly established property interest in renewal of [the] license." 690 F.3d at 935. In support of this, the Court found, first, that there was no Missouri law establishing that licensed facilities have a property interest in a license renewal. *Id.* Next, it found that existing Eighth Circuit law on this issue from other jurisdictions was highly case specific and depended in large part on how much discretion a licensing agency held in determining whether to renew a license. *Id.* at 935-36.

The Court then examined the statutes and regulations governing DHSS's licensing determinations as to childcare facilities, and determined they were "broad, subjective, and [gave] the department substantial discretion...." *Id*. at 936. The Court noted that DHSS was permitted to deny, suspend, or revoke the license of any party that failed to obey the statutory provisions or the regulations governing childcare facilities. The regulations permitted DHSS to govern "everything from fire safety and disaster preparedness to nutrition and food service, health care, and medical examination reporting requirements." *Id*. (internal citation omitted). Some of the regulations were entirely subjective. In light of all of these considerations, the *Austell* court held the defendants were entitled to qualified immunity because they reasonably could have concluded that plaintiffs had no constitutionally protected property interest in the renewal of their license.

Here, as in *Austell*, DHSS has the authority to determine whether adult day care programs and applicants are in compliance with licensure laws and regulations before issuing a license. Mo. Rev. Stat. § 192.2250; 19 Mo. Code Regs. 30-90.020(6), (7). As in *Austell*, here the statutes and regulations governing adult day care center licensing are broad, subjective, and give DHSS substantial discretion. They permit DHSS to govern nearly everything, including fire safety, daily

programming, health care, and staffing. The regulations include such discretionary requirements as:

- Each participant of the adult day care program shall be assured of the following rights:
  (A) To be treated as an adult, with respect and dignity regardless of race, color, sex or creed;
  (B) To participate in a program of services and activities which promote positive attitudes regarding one's usefulness and capabilities;…

  19 Mo. Code Regs. 30-90.050(9).

- Direct care paid staff shall be at least eighteen (18) years of age and qualified by education, training, experience or demonstrated competence in order to perform the duties required by the written job description.

  19 Mo. Code Regs. 30-90.040(4).

- The adult day care program building shall be safe and suitable for participants.

  19 Mo. Code Regs. Ann. 30-90.070(1)(A).

- Furniture shall be of a size and design so that it is easily used by persons with limited agility.

  19 Mo. Code Regs. Ann. 30-90.070(1)(D).

I have not found, and the parties have not presented, any new Missouri or Eighth Circuit case holding that license holders have a constitutionally protected property interest in a license renewal, or otherwise contradicting *Austell*. Because of this, and because of the close similarity between the laws considered in *Austell*

and those in question here, I will follow the holding in *Austell*.  I conclude that defendants are protected by qualified immunity as to this claim because they could reasonably have concluded that Patton had no constitutionally protected property interest in the renewal of her license.

*Failure to Conduct Exit Interview and Provide Statement of Deficiencies*

Patton's complaint also asserts her due process rights were violated when defendants Niekamp and Williamson failed to conduct an exit interview with her upon completion of their December 2008 inspection and then failed to timely provide her with a statement of deficiencies.  *See* Mo. Rev. Stat. § 192.2210.1.[4] An exit interview is required by Missouri law whenever an agent of DHSS finds, upon inspection, that a facility is not in compliance with licensure requirements. Mo. Rev. Stat. § 192.2210.1.  DHSS is required to send a statement of deficiencies within ten (10) working days of the date of inspection.  *Id*.  If Patton is claiming an interview and deficiency statement were part of the process she was entitled to before DHSS refused to renew her medical model license, her claims fail because defendants are protected by qualified immunity, as discussed above.

If Patton is alleging that she had an independent, constitutionally protected property interest in an interview and deficiency statement, then her claims also fail.

---

[4] Plaintiff in her opposition to summary judgment and the AHC in its opinion reference Mo. Rev. Stat. § 198.026 for this requirement, but that statute currently appears to regulate convalescent, nursing, and boarding homes.  In any case, the statutes both mandate exit interviews, and there is no difference in outcome of the argument for purposes of this case.

The Eighth Circuit has noted that if a state statute gives someone "the right to a certain outcome in the event of the occurrence of certain facts" then that person has "a right, by virtue of the Fourteenth Amendment, to whatever process is due in connection with the determination of whether those facts exist." *Bagley v. Rogerson*, 5 F.3d 325, 328 (8th Cir. 1993). However, a state statute that is a "direct command" that a certain action be taken does not create a right or entitlement subject to specific factual findings, and therefore, does not create a question of procedural due process. *Id.* at 328-29. It is "emphatically not the law" that every state statute that imposes a mandatory duty, or creates a legal right, is constitutional in nature, or that any violation of state law constitutes a violation of due process. *Id.* "A violation of state law, without more, is not the equivalent of a violation of the Fourteenth Amendment." *Id.*

In *Austell*, the Eighth Circuit followed its reasoning in *Bagley* in concluding that a Missouri statute requiring a settlement offer to be made in conjunction with the denial of a childcare facility license renewal did not create a due process right. It held that the mandatory settlement offer was simply a "state conferred procedural safeguard" not enforceable under the Due Process Clause of the Federal Constitution. The same reasoning applies here. The mandate contained in Mo. Rev. Stat. § 192.2210.1 that an exit interview be conducted and a statement of deficiencies be provided does not create "right[s] subject to particular factual

findings." As a result, an exit interview and deficiency statement are merely state conferred procedural safeguards, and the defendants' failure to provide them did not deprive Patton of any constitutionally protected property interest. *See Bagley,* 5 F.3d at 328-29.

### Remaining Due Process Allegations

Patton has alleged that her due process rights were violated when DSS terminated her Medicaid provider agreement and because Cleeton revoked her license in June and July 2009 without notifying Patton of her right to appeal.

With respect to the former, Patton has asserted no fact or argument indicating what process she claims she was due or denied with respect to her Medicaid provider agreement. Additionally, the undisputed facts show that none of the defendants, all of whom were DHSS employees, were personally involved in or directly responsible for DSS's decision to terminate Patton's Medicaid provider agreement.

"Liability under § 1983 requires a causal link to, and direct responsibility for, the alleged deprivation of rights." *Madewell v. Roberts*, 909 F.2d 1203, 1208 (8th Cir. 1990); *see also Martin v. Sargent*, 780 F.2d 1334, 1338 (8th Cir. 1985) (claim not cognizable under § 1983 where plaintiff failed to allege defendant was personally involved in or directly responsible for incidents that injured plaintiff); *Cross v. MHM Corr. Servs., Inc.*, No. 4:11CV1544 TIA, 2014 WL 5093298, at *5-

*7 (E.D. Mo. Oct. 10, 2014) (defendants not liable where plaintiff failed to establish direct responsibility for alleged constitutional violations). All of the defendants have submitted affidavits stating they did not terminate Patton's Medicaid provider agreement. Blum, Williamson, and Cleeton have submitted affidavits stating they did not make any statements to government officials that plaintiff had received Medicaid overpayments. Although Patton has submitted evidence that Niekamp sent an email to DSS communicating her concerns that POM was operating without a licensed nurse (Pl. Ex. E), Niekamp testified that she had no authority over what DSS did with that information (Def. Ex.G; Def Response to Plaintiff's Statement of Facts, Ex.A., p.107). Plaintiff has provided no evidence contradicting this sworn testimony.

With respect to the revocation of Patton's day care license, Patton's complaint alleges her license was revoked by letters from Cleeton and "Mr. Younger" on June 4, 2009 and July 7, 2009. She claims her due process rights were violated because neither letter notified her of her right to appeal the revocation decision. The July 7, 2009 letter is signed by Matt Younger and states that Patton's license was first revoked on July 1, 2009. (Def. Ex. D). Younger's letter clearly informs Patton of her right to appeal DHSS's revocation decision; therefore, Patton's claim as to the July 1 letter will be dismissed. Patton has submitted no evidence rebutting defendants' contention (as evidenced by the

Younger letter) that her license was not revoked until July 1, 2009. If her license was not revoked until July 1, Patton was not entitled to notice of her right to appeal the revocation prior to that date and her claim as to the alleged June letter also fails.[5]

Finally, Patton has argued that her due process claim should not be dismissed because certain issues relevant to the claim were decided by the AHC, and the AHC's decision is binding on this court. Specifically, Patton claims that the AHC determined the following factual issues, which she argues are dispositive to her due process claim: (1) Patton should have had a medical model license from December 20, 2008 to February 20, 2009; (2) DHSS failed to comply with Missouri statute by refusing to issue POM a medical model license; (3) POM had a nurse on duty and, as such, there was no reason not to continue its license as a medical model; and (3) Section 198.026.1 requires an exit interview and DHSS's failure to conduct one indicates its agents were not acting in good faith.

"[U]nder collateral estoppel, or issue preclusion, once a court has decided an issue of fact or law necessary to its judgment, that decision precludes relitigation of the issue in a suit on a different cause of action involving the same parties or privities." *Kinsky v. 154 Land Co., LLC*, 371 S.W.3d 108, 112 (Mo. Ct. App.

---

[5] Neither party actually submitted the June letter as evidence.

2012).[6]  Assuming, without deciding, that collateral estoppel applies in this case as to the above issues, this does not affect my conclusions as to Patton's due process claim.  Although the AHC did find that DHSS had violated Missouri statutory law, it did not make a due process determination, and it did not form any conclusions as to whether Patton had a constitutionally protected property interest in the renewal of her license.  Additionally, the defendants' bad faith in failing to conduct an exit interview does not mean they forfeit their qualified immunity as to her constitutional claims.  *See Davis v. Scherer,* 468 U.S. 183, 194 (1984) (officials sued for constitutional violations do not lose their qualified immunity merely because their conduct violates a state statutory or administrative provision); *Elder v. Holloway*, 510 U.S. 510, 515 (1994).  In light of this, I conclude that Patton's collateral estoppel argument fails to save her due process claim.

### B.    Count II:  Equal Protection

In Count II, Patton alleges that the defendants violated her right to equal protection by treating her differently than similarly situated Caucasian adult day care providers. She alleges that defendants Cleeton, Niekamp, and Williamson intentionally furthered defendant Blum's demonstrated racial animus toward Patton by arbitrarily and selectively enforcing licensure standards and Medicaid program participation requirements.

---

[6] Missouri law on collateral estoppel applies.  *See Simmons v. O'Brien*, 77 F.3d 1093, 1096 (8th Cir. 1996).

The equal protection clause is applicable to discriminatory governmental action in the administration and enforcement of the law. *Britton v. Rogers*, 631 F.2d 572, 577 (8th Cir. 1980). A plaintiff claiming unequal enforcement of a facially neutral statute is required to show both that the enforcement had a discriminatory effect, and that enforcement was motivated by a discriminatory purpose. *United States v. Bell*, 86 F.3d 820, 823 (8th Cir. 1996).[7] "To establish discriminatory effect in a race case, the claimant must show people of another race violated the law and the law was not enforced against them." *Id.*

Patton has presented no evidence that these defendants have enforced Missouri's adult day care licensing statutes and regulations in a discriminatory manner or that their enforcement of the laws has had a discriminatory effect. Although her complaint alleges the licensure laws are applied differently to Caucasian providers, Patton has failed to provide any evidence tending to show this. In fact, defendants have submitted affidavits stating they treated Patton no differently than any other adult day care provider.

---

[7] There is Eighth Circuit case law addressing claims related to police investigation and arrest, which indicates that a § 1983 equal protection claim may be sustained where a plaintiff has direct evidence of racial animus. *See, e.g., Johnson v. Crooks*, 326 F.3d 995, 1000 (8th Cir. 2003); *United States v. Frazier*, 408 F.3d 1102, 1108 (8th Cir. 2005); *Rodgers v. Knight*, 781 F.3d 932, 946 (8th Cir. 2015). Assuming direct evidence would be sufficient in a state licensing case, Patton's claim still fails. Patton has arguably presented direct evidence of racial animus on the part of defendant Blum; however, Patton's equal protection claim is based on events that took place after Blum's inspection, and Patton has presented no direct evidence of racial animus on the part of any of the remaining defendants. She has also submitted no evidence indicating Blum was involved in any of the events relevant to her equal protection claim.

In her opposition to summary judgment, Patton argues that she is alleging her equal protection claim as a "class of one." *See Village of Willowbrook v. Olech*, 528 U.S. 562, 564 (2000). A class of one claimant prevails by showing "she has been intentionally treated differently from others similarly situated and that there is no rational basis for the difference in treatment." *See Costello v. Mitchell Pub. Sch. Dist. 79*, 266 F.3d 916, 921 (8th Cir. 2001) *citing Olech*, 528 U.S. at 564. "Identifying the disparity in treatment is especially important in class-of-one cases." *Barstad v. Murray Cnty.*, 420 F.3d 880, 884 (8th Cir. 2005). As discussed above, the only evidence presented by the parties on summary judgment indicates that defendants treated Patton the same as they would treat any other adult day care provider. Therefore, I conclude Patton's equal protection claim fails as a matter of law, and I will grant defendants' motion for summary judgment as to Count II.

### C.   Count III:  First Amendment

In Count III, Patton claims Cleeton, Niekamp, and Williamson wrongfully accused, or permitted others to wrongfully accuse, her of receiving Medicaid overpayments. She asserts these accusations were made for the purposes of suppressing her "right to speak out" and dissuading state officials from intervening on her behalf. She also claims that in retaliation for her exercise of her First

Amendment rights in reporting Blum's behavior, defendants worked in concert to shut down POM.

To the extent Patton claims her First Amendment rights were violated because she was unable to petition the government for redress of her grievances, *see* U.S. Const. amend. I, she has failed to oppose defendants' motion for summary judgment. Furthermore, Patton's deposition testimony indicated she was able to vigorously petition her government, having spoken with multiple state representatives, the Missouri Governor's Office, and the Missouri Attorney General regarding her grievances. Plaintiff asserts that the state officials she met with did not help her, but as defendants point out, the First Amendment does not impose an obligation on the government to help. *See Smith v. Arkansas State Highway Emp., Local 1315*, 441 U.S. 463, 465 (1979) (the First Amendment imposes no obligation on the government to listen or respond). In light of this, Patton's First Amendment claim related to her alleged inability to petition the government for redress of grievances will be dismissed.

To establish a First Amendment retaliation claim under 42 U.S.C. § 1983, a plaintiff must show that "[she] engaged in protected activity, that the defendants' actions caused an injury to the [plaintiff] that would chill a person of ordinary firmness from continuing to engage in the activity, and that a causal connection exists between the retaliatory animus and the injury." *Small v. McCrystal*, 708

F.3d 997, 1008 (8th Cir. 2013); *see also Revels v. Vincenz*, 382 F.3d 870, 876 (8th Cir. 2004).

Plaintiff's opposition to summary judgment argues that she engaged in protected activity primarily in October 2008 when she called defendant Cleeton on the day of Blum's inspection to report Blum's behavior, called Mary Collier on October 20 to complain about Blum's behavior, and sent a letter to Collier on October 21 to further report Blum's behavior. She argues that defendants retaliated against her by: (1) causing DHSS's counsel to write a "threatening" letter admonishing her to cooperate with future inspections; (2) failing to act in good faith or to protect clients, but instead engaging in behavior to undermine Plaintiff's business; (3) communicating false information to third parties and not correcting it; and (4) providing false communications that led directly to DSS's decision to terminate Patton's provider's agreement and conduct an unplanned audit of her business, effectively shutting her down.

Two of Patton's assertions of retaliation fail because there is no evidence the defendants were personally involved in or directly responsible for the activity alleged. The threatening letter Patton claims was sent to her was signed by Nina Hazelton, who is not a defendant to this action. (Pl. Ex. 15). Patton has provided no evidence indicating defendants had any direct responsibility for the letter.

Patton has also failed to support her claim that defendants communicated false information to DSS and failed to correct it.  Her only evidence supporting this allegation is a February 2009 letter to her from DSS in which DSS states that DHSS notified it that Patton's medical license was canceled effective December 20, 2008.  Although the letter does suggest DHSS communicated information about Patton to DSS, Patton has provided no evidence that any of the defendants were directly responsible for the communication.[8]  Furthermore, Patton's only evidence that defendants failed to correct the false information is Niekamp's deposition testimony that she does not recall whether she notified anyone at DSS that their information was false.  None of this is sufficient to create an issue of material fact regarding defendants' involvement in the provision of false information to DSS.

Patton also claims defendants provided false communications that led directly to DSS's termination of her Medicaid provider agreement and its decision to conduct an audit of POM.  Plaintiff has submitted evidence showing that Niekamp sent an email to employees of DSS expressing concern that POM had not employed a nurse for several years.  However, the email alone is not an action that would "chill a person of ordinary firmness from continuing in the activity."  *See*

---

[8] Patton's brief does not make clear which part of this letter she is claiming was false, but presumably it is the information DSS claims it was given by DHSS – namely, that Patton's medical model license was "canceled."

*Naucke v. City of Park Hills*, 284 F.3d 923, 928 (8th Cir. 2002) (holding that the public scolding and name-calling of plaintiff and the public posting of a picture of plaintiff's home with an unflattering caption, among other things, would be insufficient to deter a person of ordinary firmness from continuing to speak out). To the extent Patton is attempting to claim Niekamp has § 1983 liability for DSS's termination of Patton's provider agreement, I have already determined she does not because she was not directly responsible for or personally involved in that decision.

Finally, Patton claims that defendants retaliated against her by "failing to act in good faith or to protect clients, but instead engaging in behavior to undermine Plaintiff's business." In support of this allegation, Patton cites to the entire AHC decision. This is insufficient. Patton cannot overcome summary judgment and create a triable issue of fact by making vague, conclusory statements about the behavior of defendants. *See, e.g., Dunavant v. Moore*, 907 F.2d 77, 80 (8th Cir. 1990) (conclusory statements that a witness is not credible are insufficient to preclude summary judgment).

### D.   Count IV:  Violation of Mo. Rev. Stat. § 536.021

In Count IV, Patton alleges that the defendants improperly barred her from participating in the Medicaid program while she had a "social model" adult day care license. She claims Missouri law does not distinguish between "medical

model" and "social model" licenses, and that a "medical model" license is not a requirement under state law to participate in the Medicaid program. Patton alleges that to the extent that the defendants treated it as a requirement, their actions constituted an unpromulgated rule in violation of Mo. Rev. Stat. § 536.021.

Defendants argue Patton's claim fails because they are not responsible for DSS's decision not to permit Patton to participate in the Medicaid program, and I agree. Patton has failed to rebut the affidavits submitted by defendants stating they did not terminate her Medicaid provider agreement. Furthermore, the letter informing Patton that her Medicaid provider agreement was terminated came from DSS, not from DHSS or any of the individuals who are defendants. No genuine dispute of material fact exists as to whether defendants barred Patton from participating in the Medicaid program or promulgated a rule making a medical model license a prerequisite for participation in the Medicaid program. I will therefore grant defendants' motion for summary judgement on this claim.

### E.    Count V:  Due Process

In Count V, Patton claims defendants caused her to be listed on the "Family Care Safety Registry" and/or "state employees disqualification lists" without providing her with notice and an opportunity to be heard either before or after the listing.

The Employee Disqualification List is a statutorily mandated list maintained by DHSS of individuals who are disqualified to work for or at its regulated agencies. *See* Mo. Rev. Stat. § 192.2490. The Family Care Safety Registry is a division of DHSS that performs background screenings for employment purposes. *See* Mo. Rev. Stat. § 210.900, *et seq.* The background screenings are performed by retrieving information from a number of sources, including criminal history information from the Missouri State Highway Patrol, child abuse/neglect information from DSS and information from the Employee Disqualification List maintained by DHSS. (Aff. Melanie Madore, ECF Doc. #47-1).

Patton's opposition to summary judgment makes it clear that this claim is based on a response she received from the Family Care Safety Registry after requesting a background screening report on herself. The letter, which was submitted by Patton as evidence, states that the Family Care Safety Registry's background screening performed on January 25, 2011 indicated the following: "Criminal history information is on file with the Missouri State Highway Patrol."

In response, defendants have submitted an affidavit from Melanie Madore, the Chief of the Family Care Safety Registry. According to Madore, the letter Patton received indicates only that the background screening report showed that a criminal history was on file for Patton with the Missouri State Highway Patrol.

The letter does not indicate that Patton's name had been put on DHSS's Employee Disqualification List.

Each of the defendants has submitted sworn affidavits stating that they did not place Patton on the Employee Disqualification List and that they provided no information regarding her criminal history to the Missouri State Highway Patrol. In light of the above, I conclude that no genuine issue of material fact exists as to whether defendants caused Patton to be listed on the Employee Disqualification List, and I will grant defendants' motion for summary judgment as to Count V.

### F.    Count VI:  Malicious Trespass

In Count VI, Patton claims that the defendants "maliciously or wantonly damaged or destroyed" her "real property and intangible property rights" in violation of Mo. Rev. Stat. § 537.330.[9]

Mo. Rev. Stat. § 537.330 provides:

> If any person shall maliciously or wantonly damage or destroy any personal property, goods, chattels, furniture or livestock, the person so offending shall pay to the party injured double the value of the things so damaged or destroyed; and upon an affidavit that said damage or destruction was wantonly or maliciously done, it shall be a good ground for an attachment to issue, as in other cases by attachment.

Defendants argue that a license is not considered personal property under Missouri law. *See State v. Seebold*, 91 S.W. 491, 493 (Mo. 1905).  Patton responded by arguing that a Missouri appellate court has held that this statute applies to

---

[9] Plaintiff's claim to the extent it pertains to real property has already been dismissed.

intangible personal property, *see Weicht v. Suburban Newspapers of Greater St. Louis, Inc.*, 32 S.W.3d 592, 599-600 (Mo. Ct. App. 2000), and claiming her license qualifies as intangible personal property because it is an "intangible right subject to ownership."

Regardless of whether Patton's day care license qualifies as intangible personal property for purposes of this statute, I conclude that there is no evidence defendants "maliciously or wantonly damaged or destroyed" it. The Missouri Court of Appeals has defined "maliciously" for purposes of this statute as "the intentional doing of a wrongful act without just cause or excuse." *Bean v. Branson*, 266 S.W. 743, 744 (Mo. Ct. App. 1924). Black's Law Dictionary defines "wanton" as "[u]nreasonably or maliciously risking harm while being utterly indifferent to the consequences." WANTON, Black's Law Dictionary (10th ed. 2014).

Patton's opposition to summary judgment does not provide much clarification regarding the exact actions she thinks defendants took to damage or destroy her license. However, as discussed above, the evidence indicates that Patton's 2008 license was not terminated; rather, it expired and was renewed on a provisional basis. Defendants did not expedite or otherwise affect the expiration of Patton's 2008 license and therefore cannot be held liable for "destroying" or "damaging" it. To the extent Patton is alleging her 2009 license was destroyed or

damaged, the evidence does not indicate defendants were involved in the decision to revoke it. The letter sent to Patton in July 2009 informing her that her 2009 license was being terminated was signed by Matt Younger, who is not a party to this case.

Furthermore, Younger's letter does not indicate that Patton's license was being "maliciously or wantonly" destroyed. Rather, it states, reasonably, that DHSS staff had found POM locked and apparently not in operation. It states DHSS tried to confirm the status of POM's operation a month previously but had received no response, and as a result, DHSS was revoking POM's license.

Because there is no disputed issue of material fact that POM's license was not "maliciously or wantonly" damaged or destroyed, I will grant defendants' motion for summary judgment as to Count VI.

Accordingly,

**IT IS HEREBY ORDERED** that, for the reasons discussed above, defendants' motions for summary judgment [#38 & #48] are **GRANTED**.

**IT IS FURTHER ORDERED** that defendants' motion for judgment on the pleadings [#34] is **DENIED** as moot.

A separate Judgment in accordance with this Memorandum and Order is entered this same date.

_____
CATHERINE D. PERRY
UNITED STATES DISTRICT JUDGE

Dated this 14th day of May, 2015.